1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   CONSERVATION CONGRESS and
     KLAMATH FOREST ALLIANCE,
12                                          NO. CIV. S-11-2605 LKK/EFB
             Plaintiffs,
13
         v.                                         O R D E R
14
     UNITED STATES FOREST
15   SERVICE,

16           Defendant,

17           and

18   SIERRA PACIFIC INDUSTRIES,

19           Proposed Defendant
             Intervenor.
20
     _____/
21

22       Plaintiff Conservation Congress brings this action against

23   Defendants United States Forest Service and United States Fish and

24   Wildlife Service (collectively, "Federal Defendants"), concerning

25   Federal Defendants' approval of a timber sale, known as the Mudflow

26   Vegetation Management Project, and its effect upon the habitat of

     the northern spotted owl.  Plaintiff's action arises under the

1  Endangered Species Act ("ESA"), the National Environmental Policy

2  Act ("NEPA"), the Administrative Procedure Act ("APA"), the

3  Declaratory Judgment Act ("DJA"), and the Equal Access to Justice

4  Act ("EAJA").

5      Pending before the court is Plaintiff's motion for a

6  preliminary injunction, brought specifically in relation to

7  Plaintiff's claims under the ESA.  Pl's Amend. Mot., ECF No. 44.

8  Federal Defendants and Defendant-Intervenor Sierra Pacific

9  Industries ("SPI") oppose.  Fed. Defs' Opp'n, ECF No. 46; Def. SPI

10 Opp'n, ECF No. 47.  For the reasons provided below, Plaintiff's

11 motion is denied.

12                        **I. BACKGROUND**

13 **A. Statutory Background**

14     The Endangered Species Act ("ESA") requires that the

15 Secretaries of the Interior and Commerce promulgate regulations

16 listing plant and animal species that are "endangered" by

17 extinction and to designate critical habitat for such species.  16

18 U.S.C. § 1533; Bennett v. Spear, 520 U.S. 154, 157-58, 117 S.Ct.

19 1154, 137 L.Ed.2d 281 (1997).  Critical habitat consists of those

20 areas which have "physical or biological features (I) essential to

21 the conservation of the species and (II) which may require special

22 management considerations or protection."  16 U.S.C. § 1532(5)(A).

23

24     Section 9 of the ESA establishes a blanket prohibition on the

25 "taking" of any member of a listed endangered species.  16 U.S.C.

26 § 1538(a)(1)(B); Oregon Natural Resources Council v. Allen, 476

2

1  F.3d 1031, 1033 (9th Cir. 2007).  To "take" is defined as "to

2  harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or

3  collect, or to attempt to engage in any such conduct."  16 U.S.C.

4  § 1532(19); Oregon Natural Resources Council, 476 F.3d at 1033 n.1.

5

6      Section 7 of the ESA allows statutorily-defined "applicants,"

7  including Federal agencies, to carve out limited exceptions to

8  Section 9's blanket prohibition under certain circumstances.  16

9  U.S.C. § 1536(a)-(c), (o).  Under Section 7, each federal agency

10  must "insure that any action authorized, funded, or carried out by

11  such agency is not likely to jeopardize the continued existence of

12  any endangered species or threatened species or result in the

13  destruction or adverse modification of habitat of such species

14  which is determined by the Secretary . . . to be critical."  16

15  U.S.C. § 1536(a)(2).  The applicable regulations define an "action"

16  to include "actions directly or indirectly causing modifications

17  to the land, water, or air."  50 C.F.R. § 402.02.

18      In addition to the ESA's substantive obligations to conserve

19  and not jeopardize protected species, Section 7(a)(2) imposes a

20  procedural obligation on federal agencies.  See Nat'l Ass'n of Home

21  Builders v. Defenders of Wildlife, 551 U.S. 644, 667, 127 S.Ct.

22  2518, 168 L.Ed.2d 467 (2007); New Mexico ex rel. Richardson v.

23  Bureau of Land Mgmt., 565 F.3d 683, 700 (10th Cir. 2009).  "An

24  agency's decision whether to take a discretionary action that may

25  jeopardize endangered or threatened species is strictly governed

26  by ESA-mandated inter-agency consultation procedures."  Forest

1   Guardians v. Johanns, 450 F.3d 455, 457 (9th Cir. 2006).  The

2   procedural obligation ensures that the agency proposing the action,

3   in this case the United States Forest Service ("USFS"), consults

4   with the United States Fish and Wildlife Service ("FWS") to

5   determine the effects of its action on endangered species and their

6   critical habitat.[1]  See Fla. Key Deer v. Paulison, 522 F.3d 1133,

7   1138 (11th Cir. 2008).

8        To meet its procedural obligation, the agency action must

9   first determine whether its proposed discretionary action may

10  affect a listed species or a critical habitat.  50 C.F.R. §

11  402.14(a).  If an agency determines that an action "may affect"

12  critical species or habitats, formal consultation is ordinarily

13  mandated.  Natural Resources Defense Council v. Houston, 146 F.3d

14  1118, 1126 (9th Cir. 1998) (citing Thomas v. Peterson, 753 F.2d

15  754, 763 (9th Cir. 1985); 50 C.F.R. § 402.14(a)).  Formal

16  consultation is excused only where (1) an agency determines that

17  its action is unlikely to adversely affect the protected species

18  or habitat, and (2) the relevant Service (FWS or NMFS) concurs with

19  that determination.  Id. (citing 50 C.F.R. § 402.14(b); Pacific

20  Rivers Council v. Thomas, 30 F.3d 1050, 1054, n.8 (9th Cir. 1994)).

21  ////

22  ////

23  ────────────────

24        [1] The FWS and the National Marine Fisheries Service administer
    the ESA.  50 C.F.R. § 402.01(b).  The "FWS has jurisdiction over
    freshwater and terrestrial species while the National Marine
25  Fisheries Service is responsible for anadromous and marine
    species."  Johanns, 450 F.3d at 457 n.1 (citing 50 C.F.R. §
26  402.01(b)).

1    If it appears from informal consultation[2] that a protected

2  species may be present in the area of a federal agency's "major

3  construction activity," then the agency must prepare a "biological

4  assessment."  50 C.F.R. § 402.12(b).  The purpose of the biological

5  assessment is to "evaluate the potential effects of the action on

6  listed and proposed species and designated and proposed critical

7  habitat and determine whether any such species or habitat are

8  likely to be adversely affected by the action and is used in

9  determining whether formal consultation or a conference is

10 necessary."  50 C.F.R. § 402.12(a).  Again, formal consultation is

11 not required if, as a result of informal consultation, the "Federal

12 agency determines with the written concurrence of the Director [of

13 the Fish and Wildlife Service], that the proposed action is not

14 likely to adversely affect any listed species or critical habitat."

15 Sierra Club v. Van Antwerp, 661 F.3d 1147, 1155 (D.C. Cir. 2011)

16 (citing 50 C.F.R. § 402.14(b)).

17    To determine a project's effects, agencies are required to

18 understand the existing conditions of the species or critical

19 habitat at issue, before they consider the effects of a proposed

20 action on those conditions.  The "environmental baseline" for

21 Section 7 consultation purposes is defined as follows:

22        The environmental baseline includes the past and
           present impacts of all Federal, State, or private
23         actions and other human activities in the action

24

25    [2] Informal consultation merely means "all discussions,
    correspondence, etc., between the Service and the Federal agency,"
    designed to assist the action agency (USFS) in determining whether
26  formal consultation will be necessary.  50 C.F.R. § 402.13(a).

area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process.

50 C.F.R. § 402.02 (definition of "environmental baseline" is included within the definition of "effects of the action"). For Section 7 consultation purposes, the "effects" of a proposed action include not only "direct" effects, but also "indirect effects," which is defined to include any effects caused or induced by the action that are "reasonably certain to occur." 50 C.F.R. § 402.02. Additionally, in meeting the Section 7 consultation requirements, agencies must utilize the best scientific and commercial data available and agencies that fail to consult properly run the risk that their activities will be enjoined. See 16 U.S.C. § 1536(a)(2); see also, e.g., Pacific Rivers Council v. Robertson, 854 F. Supp. 713, 724 (D. Or. 1993) (holding that procedural violations of the ESA, such as not initiating Section 7(a)(2) consultation when required, mandate that the underlying action be enjoined), aff'd in part, rev'd in part sub nom., Pacific Rivers Council v. Thomas, 30 F.3d 1050 (9th Cir. 1994).

**B. Factual Background**

The northern spotted owl has been listed as a threatened species by the U.S. Fish and Wildlife Service ("FWS"). See Shasta-Trinity National Forest, Biological Assessment Mudflow Vegetation Management Project, MAR002558-2580, at 8 (Feb. 15, 2008) ("Biological Assessment"). Critical habitat for the northern

6

1    spotted owl was proposed within the Federal Register on May 6,
2    1991, and a Final Rule was published on January 15, 1992.    Id.
3    (citing 56 Fed. Reg. 20816-21016; 57 Fed. Reg. 1796-1838).    On
4    September 12, 2008, a Final Revised Critical Habitat Rule for the
5    northern spotted owl became effective.    See Fish & Wildlife
6    Service, Second Letter of Concurrence, FWS AR 001317-1331, at 1-2
7    (Feb. 10, 2012) ("2nd LOC") (citing 73 Fed. Reg. 47326-47522).    The
8    Mudflow Project area contains 888 acres within the 2008 Critical
9    Habitat designation subunit C-70 and 3,392 acres within the
10   Critical Habitat subunit C-72.    Id. at 2.

11       The area encompassing the Mudflow Project has been surveyed
12   for northern spotted owls "annually to protocol" starting in 2004
13   through 2007.    Biological Assessment, at 9.    According to the
14   Biological Assessment for the Mudflow Project, which was based on
15   the 1992 Final Critical Habitat Rule, the nearest known owl nests
16   (ST-211 and ST-213) are located approximately .6 miles to the east
17   and 1 mile to the west, respectively.    Id.    Portions of both 1.3
18   mile radius owl home ranges are within the project assessment area.
19   Id.    Starting in 1992, annual historical checks have occurred in
20   most years at both nest sites.    Id.    Owls in ST-211 were last known
21   to nest in 1992.    Id.    A single male was located in the vicinity
22   of this nest core in 2006.    Id.    Owls in ST-213 were last known to
23   breed in 1992 and a single male was last heard in 1994.    Id.    In
24   2005, a single male northern spotted owl was heard approximately
25   1 mile to the northeast of the nest core on Forest Service land
26   during surveys conducted by a private landowner, but the owl was

7

1 not relocated by Forest Service personnel on subsequent surveys.

2 Id.  There are no known owl locations on private ownership within

3 1.3 miles of the Mudflow Project.  Id.

4 The proposed area for the Mudflow Project encompasses

5 approximately 10,430 acres of Forest Service land and 3,400 acres

6 of private land.  Id.  The project area contains 510 acres of

7 suitable nesting/roosting habitat and 5,125 acres of foraging

8 habitat.  Id.  There are no activities proposed within 1/4 mile of

9 the known nest cores of ST-213 and ST-211.  Id. at 10.  Protocol

10 surveys conducted during 2004, 2005, 2006, and 2007 in all areas

11 of potential nesting, roosting, or foraging habitat in the Mudflow

12 Project did not detect any additional owls.  Id.

13 According to the Biological Assessment, the Mudflow Project

14 will "degrade" 1,719 acres of foraging habitat for the northern

15 spotted owl overall, 215 acres of which are within the owl's "home

16 range" (1.3 mile radius) and 18 acres of which are within the owl's

17 "territory" (.7 mile radius).  Id. at 11.  "Degraded" is defined

18 as a reduction in some habitat components, but the habitat would

19 still function at the current habitat level.  Id.    T h e

20 Biological Assessment indicates that none of the Mudflow Project

21 area will be "downgraded" or "removed."  Id.  "Downgraded" is a

22 term of art which "indicates that there is a temporary reduction

23 (approximately 30 years) in nesting/roosting or foraging habitat."

24 Id.  "Removed" is a term of art which "indicates that the habitat

25 would not longer function as nesting/roosting or foraging"

26 habitat."  Id.  The Biological Assessment concludes with a

1   determination that the proposed Mudflow Project "[m]ay affect, but

2   is not likely to adversely affect" the northern spotted owl.   Id.

3   at 15.

4        The FWS issued an initial letter of concurrence with the

5   Biological Assessment for the Mudlfow Project on April 28, 2008.

6   See 2nd LOC, at 1.   On February 10, 2012, in order to take into

7   account both the 2008 Final Revised Critical Habitat Rule for the

8   Northern Spotted Owl and the 2011 Revised Recovery Plan for the

9   Northern Spotted Owl ("Recovery Plan"), the FWS issued a second

10  letter of concurrence.   Id. at 1-2.

11  **C. Plaintiff's Complaint**

12       Plaintiff Conservation Congress filed its original complaint

13  on October 3, 2011, and its first supplemental complaint on March

14  22, 2012.   Pl's Compl., ECF No. 1; Pl's First Suppl. Compl., ECF

15  No. 40.   In its first supplemental complaint, Plaintiff makes,

16  inter alia, the following assertions:

17       The 2011 Recovery Plan for the northern spotted owl notes that

18  "past habitat loss, current habitat loss and competition from

19  Barred Owls" were "the most pressing threats to [northern] spotted

20  owl persistence," and that active management projects should

21  explicitly evaluate the short-term impacts to the Northern Spotted

22  Owl and its prey while considering the long-term ecological

23  benefits of such projects.   Id. (citing 76 Fed. Reg. 38575).

24       According to Plaintiff, the most recent scientific evidence

25  analyzing northern spotted owl population and demographic trends

26  indicate that, despite over 20 years of legal protection under the

1    ESA, the species' population is declining by 3%-4% each year.  Id.
2    at 13-14.

3         The Mudflow Project is only one of many projects that involve
4    tree cutting on lands managed by the Shasta-Trinity National Forest
5    that are designated as critical habitat for the northern spotted
6    owl.  Id. at 15.   USFS has analyzed and/or approved several
7    projects that also involve tree cutting in northern spotted owl
8    habitat including the Algoma, Pilgrim, Moosehead and East McCloud
9    projects.  Id.

10        FWS has conducted no surveys for northern spotted owl's in the
11   Mudflow Project area since 2007.  Id.  Seventeen percent of the
12   existing foraging habitat within the home range of a spotted owl
13   pair, designated as ST-211, will be degraded in the Mudflow
14   Project.  Id. Despite this level of degradation, in its Biological
15   Assessment, USFS did not evaluate the spatial relationship of its
16   proposed logging to the existing habitat features of this area,
17   even though spatial patterns of logging units vis-a-vis existing
18   habitat, are considered by experts to be important to the survival
19   of Owls post-logging.  Id.

20        Based on the 2008 critical habitat rule, the Mudflow Project
21   area contains 888 acres of designated critical habitat in unit "C-
22   70" and 3,392 acres in unit "C-72," for a total of 4,280 acres of
23   critical habitat.  Pl's Reply, ECF No. 49, at 3.[3]  The Project will

24   _____

25        [3] Initially, Plaintiff alleged calculations for the Mudflow
     Project's effects on northern spotted owl critical habitat using
     the 1992 critical habitat rule.  Following briefing by the parties
26   in support of the instant motion, Plaintiff offers recalculations

1    encompass 19% of the total critical habitat in unit C-70 and 11%

2    of the total critical habitat in unit C-72.  Id.  The 544 acres

3    that USFS and FWS propose to treat are comprised of 408 acres of

4    foraging habitat, 128 acres of dispersal habitat, and 8 acres of

5    non-capable habitat.  Id.  USFS's proposed treatments include 340

6    acres of natural stand thinning, 22 acres of thinning with

7    sanitation, and 46 acres of shaded fuelbreak.  Id.  Plaintiff

8    alleges that these treatments "appear to be targeted at *all* the

9    foraging habitat, the highest quality remaining habitat[] included

10   in the Project."  Id. at 3-4.

11        Plaintiff asserts that, in its Second Letter of Concurrence,

12   FWS fails to consider: the 2011 Revised Recovery Plan for the

13   Northern Spotted Owl; or FWS's Biological Opinion on USFS's Algoma

14   Project.  Pl's Am. Compl., ECF No. 40, at 20.  Plaintiff further

15   asserts that FWS conducted no surveys in the Mudflow Project area

16   since 2007, even though FWS revised its survey protocol in 2011 to

17   better detect both Barred Owls (a competitor species to the

18   Northern Spotted Owl) and northern spotted owls.  Id.

19        Plaintiff brings two claims under the ESA alleging: (1)

20   inadequate biological assessment on the part of USFS, in violation

21   of 16 U.S.C. § 1536 and 50 C.F.R. § 402.12(a); and (2) arbitrary

22   concurrence letters on the part of FWS, in violation of 16 U.S.C.

23   § 1536(a)(2) and 50 C.F.R. § 402.14(a).  Id. at 22-25.

24        On April 5, 2012, Federal Defendants filed an answer to

25   _____

26   based on the 2008 critical habitat rule.

11

1   Plaintiff's supplemental complaint, <u>see</u> Fed. Defs' Answer, ECF No.

2   41, as did Defendant-Intervenor Sierra Pacific Industries, <u>see</u> Def-

3   Intervenor's Answer, ECF No. 42.

4   **D. Plaintiff's Motion for Preliminary Injunction**

5        On April 9, 2012, Plaintiff filed the pending motion for a

6   preliminary injunction.  Pl's Amend. Mot., ECF No. 44.

7        On April 30, 2012, Federal Defendants and Defendant-Intervenor

8   Sierra Pacific Industries filed oppositions to Plaintiff's motion

9   for a preliminary injunction.  <u>See</u> Fed. Defs' Opp'n, ECF No. 46,

10  Def-Int's Opp'n, ECF No. 47.

11  **II. STANDARD OF REVIEW FOR A PRELIMINARY INJUNCTION UNDER THE**

12  **ENDANGERED SPECIES ACT**

13       Fed. R. Civ. P. 65 provides authority to issue preliminary

14  injunctions.  A preliminary injunction is an "extraordinary

15  remedy."  <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7,

16  22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (internal citation

17  omitted).  When a court considers whether to grant a motion for a

18  preliminary injunction, it traditionally balances "the competing

19  claims of injury, . . . the effect on each party of the granting

20  or withholding of the requested relief, . . . the public

21  consequences in employing the extraordinary remedy of injunction,"

22  and plaintiff's likelihood of success.  <u>Id.</u> at 20, 24 (quoting

23  <u>Amoco Prod. Co. v. Gambell</u>, 480 U.S. 531, 542, 107 S.Ct. 1396, 94

24  L.Ed.2d 542 (1987); <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305,

25  312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)).

26       Under the traditional approach, a plaintiff seeking a

1  preliminary injunction must demonstrate that he is "likely to
2  succeed on the merits, that he is likely to suffer irreparable harm
3  in the absence of preliminary relief, that the balance of equities
4  tips in his favor, and that an injunction is in the public
5  interest." Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 559
6  F.3d 1046, 1052 (9th Cir. 2009) (citing Winter, 555 U.S. at 20).
7  Alternatively, "'serious questions going to the merits' [rather
8  than a likeliness of success on the merits] and a hardship balance
9  that tips sharply toward the plaintiff can support issuance of an
10 injunction, assuming the other two elements of the Winter test are
11 also met." Alliance For The Wild Rockies v. Cottrell, 632 F.3d
12 1127, 1132 (9th Cir. 2011).

13      By enacting the ESA, Congress altered the normal standards for
14 injunctions under Federal Rule of Civil Procedure 65.  The Ninth
15 Circuit has consistently held that "[t]he traditional preliminary
16 injunction analysis does not apply to injunctions issued pursuant
17 to the ESA." Nat'l Wildlife Fed'n v. NMFS, 422 F.3d 782, 793 (9th
18 Cir. 2005).  The Supreme Court explained that in enacting the ESA
19 "Congress has spoken in the plainest of words, making it abundantly
20 clear that the balance has been struck in favor of affording
21 endangered species the highest of priorities." Tenn. Valley Auth.
22 v. Hill, 437 U.S. 153, 194, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).
23 "Accordingly, courts may not use equity's scales to strike a
24 different balance." Nat'l Wildlife Fed'n, 422 F.3d at 794
25 (internal quotation omitted). "The  appropriate remedy for
26 violations of the ESA consultation requirements is an injunction

1   pending compliance with the ESA." <u>Wash. Toxics Coalition v.</u>
2   <u>Environmental Protection Agency</u>, 413 F.3d 1024, 1035 (9th Cir.
3   2005) (upholding an injunction prohibiting the EPA from authorizing
4   the use of certain pesticides within proscribed distances of
5   salmon-bearing waters until it had fulfilled its consultation
6   obligations under § 7(a)(2) of the ESA).

7                              **III. ANALYSIS**

8       Plaintiff asserts a procedural violation of the ESA due to
9   Federal Defendants' failure to engage in the formal consultation
10  required by Section 7(a)(2).

11      The Tenth Circuit has indicated that, to challenge the
12  agency's failure to undertake formal consultation, a plaintiff may
13  utilize the ESA's citizen-suit provision, 16 U.S.C. §
14  1540(g)(1)(A). <u>Rio Grande Silvery Minnow v. Bureau of Reclamation</u>,
15  601 F.3d 1096, 1106 n.3 (10th Cir. 2010). Under this provision,
16  "any person may commence a civil suit . . . to enjoin any person,
17  including the United States and any other governmental
18  instrumentality or agency . . . who is alleged to be in violation
19  of any provision of [the ESA] or regulation issued under the
20  authority [of the ESA]; . . . ." 16 U.S.C. § 1540(g)(1)(A).
21  However, to challenge discretionary final agency actions of the FWS
22  and other federal agencies under the ESA, plaintiffs must utilize
23  the Administrative Procedure Act ("APA"). <u>See</u> 5 U.S.C. § 706(2);
24  <u>Bennett v. Spear</u>, 520 U.S. 154, 174-75, 117 S.Ct. 1154, 137 L.Ed.2d
25  281 (1997).

26      Plaintiff and Federal Defendants dispute whether Plaintiff's

                                   14

1  claims against the USFS and the FWS arise under the ESA citizen

2  suit provision or the APA.  Because the APA governs judicial review

3  of agency action challenged through the ESA citizen-suit provision,

4  see 5 U.S.C. § 706; Friends of Endangered Species, Inc. v. Jantzen,

5  760 F.2d 976, 981–82 (9th Cir. 1985); Rio Grande Silvery Minnow,

6  601 F.3d at 1106 n.3 (citing Coal. for Sustainable Res., Inc. V.

7  U.S. Forest Serv., 259 F.3d 1244, 1249 (10th Cir. 2001)), the APA

8  will provide the standard of review for both of Plaintiff's

9  relevant claims, regardless of the statutory authority under which

10  the claims arise.  At this stage in the proceedings, the court

11  therefore declines to analyze whether Plaintiffs claims against the

12  USFS and FWS arise under the ESA Section 11(g) citizen suit

13  provision or the APA.[4]

14  ———————————————————

15      [4] The court must note, however, the ESA Section 11(g) citizen-
   suit requirement that 60-day written notice be provided to the

16  appropriate Secretary and to any alleged violator intended to be
   a defendant in the lawsuit.  See 16 U.S.C. § 1540(g)(2)(A), (B),
   and (C).  A proper 60-day notice of intent must sufficiently alert

17  the recipient of the actual alleged violation, so that the
   recipient may attempt to abate the violation.  Southwest Ctr. for

18  Biological Diversity v. Bureau of Reclamation, 143 F.3d 515, 521
   (9th Cir. 1998).  The Ninth Circuit considers this requirement

19  jurisdictional.  Marbled Murrelet v. Babbitt, 83 F.3d 1068, 1072
   (9th Cir. 1996).

20      Here, the administrative record indicates that a 60-day notice
   of intent to sue, from Plaintiff Conservation Congress was received

21  by Sharon Heywood, the Forest Supervisor for the Shasta-Trinity
   National Forest of the USFS, on July 13, 2011--over 60 days before

22  Plaintiff's filing of its original complaint in this action.
   See Letter from Denise Boggs, Conservation Congress, Sixty-Day

23  Notice of Intent to Sue (Jul. 13, 2011).  The letter was also
   addressed to Ken Salazar, Secretary of the Interior, for the U.S.

24  Department of the Interior.  Id. at 1.  In addition to being filed
   in a timely manner, the letter is explicitly identified as a 60-day

25  notice of intent to sue under ESA Section 11(g), see id. at 1; it
   clearly provides notice of the violation upon which Plaintiff sued,

26  see, e.g., id. at 2 ("the USFS and USFWS have contravened the

**A. Likelihood of Success on the Merits**

   **i. Standard of Review**

   Under the APA, a court may disturb an agency's final action only if that final action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is "highly deferential, presuming agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." <u>Independent Acceptance Co. v. California</u>, 204 F.3d 1247, 1251 (9th Cir. 2000). A reviewing court must not "substitute its judgment for that of the agency" concerning the proposed action. <u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Rather, a court must determine whether the decision was "based on a consideration of relevant factors" and whether "the agency has taken a 'hard look' at the environmental consequences of its proposed action." <u>Blue Mountains Biodiversity Project v. Blackwood</u>, 161 F.3d 1208, 1211 (9th Cir. 1998). That is, the agency must state a rational connection between the facts found and the decision made. <u>Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.</u>, 378 F.3d 1059, 1065 (9th Cir. 2004). The standard

----

requirements of the ESA by . . . failing to initiate formal consultation with the USFWS"); and it appears to have been served upon the relevant Secretary (the Secretary of the Interior) as well as the alleged ESA violator (the USFS). This letter was therefore sufficient to satisfy the jurisdictional requirement of notice under 16 U.S.C. § 1540(g)(2)(A)(i). To the extent that Plaintiff asserts an ESA claim against the USFS, brought pursuant to the ESA citizen suit provision of 16 U.S.C. § 1540(g)(1)(A), this court has jurisdiction to hear that claim.

1  does not shield the agency from a "thorough, probing, in-depth

2  review." Seattle Audubon Soc'y v. Moseley, 798 F.Supp. 1473, 1476

3  (W.D. Wash. 1992) (quoting Citizens to Preserve Overton Park, 401

4  U.S. at 415, 91 S.Ct. 814).

5       In reviewing environmental actions, in particular, the Ninth

6  Circuit has explicitly provided that the "highest deference is owed

7  to the Forest Service's technical analyses and judgments within its

8  area of expertise." Leaque Of Wilderness Defenders Blue Mountains

9  Biodiversity Project v. Allen, 615 F.3d 1122, 1131 (9th Cir. 2010)

10  (citing Lands Council v. McNair, 537 F.3d 981, 993 (9th Cir. 2008),

11  overruled on other grounds by American Trucking Ass'ns Inc. v. City

12  of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009)).  The Ninth

13  Circuit has further provided that agencies are entitled to

14  deference relative to their interpretation of their own

15  regulations, including forest plans, and that, under the APA, the

16  court's role in reviewing agency actions is not to weigh

17  conflicting expert opinions or to consider whether the agency

18  employed the best methods, but instead, when an agency's particular

19  technical expertise is involved, to guard the agency's discretion.

20  See Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089, 1097,

21  1099 (9th Cir. 2003); Friends of Endangered Species, Inc. v.

22  Jantzen, 760 F.2d 976, 986 (9th Cir. 1985); Marsh v. Or. Natural

23  Res. Council, 490 U.S. 360, 376-77, 109 S.Ct. 1851, 104 L.Ed.2d 377

24  (1980).

25       **ii. Analysis**

26       Underlying the test for injunctive relief is the requirement

17

1  that Plaintiff demonstrate at least some probability of success on
2  the merits.  See Sports Form, Inc. v. United Press Int'l, Inc., 686
3  F.2d 750, 753 (9th Cir. 1982) (citing Benda v. Grand Lodge of
4  International Association of Machinists & Aerospace Workers, 584
5  F.2d 308, 315 (9th Cir. 1978), cert. dismissed, 441 U.S. 937, 99
6  S.Ct. 2065, 60 L.Ed.2d 667 (1979)).  For the reasons explained
7  below, the court determines that Plaintiff has not established a
8  probability of success on the merits of its claims.  Accordingly,
9  the court denies Plaintiff's request for injunctive relief.
10      Plaintiff claims that the USFS and the FWS were arbitrary and
11 capricious in their determination that the Mudflow Project was not
12 likely to adversely affect the Northern Spotted Owl and that formal
13 consultation, therefore, should have been required.  A plaintiff's
14 burden in establishing a procedural violation of the ESA is to show
15 that the circumstances triggering the procedural requirement exist
16 (i.e., that the agencies were arbitrary and capricious in
17 determining that the Mudflow Project is not likely to adversely
18 affect the Northern Spotted Owl), and that the required procedures
19 have not been followed (i.e., the USFS and the FWS did not engage
20 in formal consultation).  See Thomas v. Peterson, 753 F.2d 754, 765
21 (9th Cir. 1985).  It is uncontested that the USFS and the FWS did
22 not engage in formal consultation.  Nonetheless, Plaintiff has not
23 met its burden of establishing that the agencies were arbitrary and
24 capricious in determining that Mudflow Project is not likely to
25 adversely affect the Northern Spotted Owl.
26 ////

1      a.  **Short-Term Impacts of the Mudflow Project on the**

2          **Northern Spotted Owl and its Prey**

3      Plaintiff argues that the USFS's biological assessment and the

4  FWS's second letter of concurrence failed to consider the short-

5  term impacts to the Northern Spotted Owl and its prey in reaching

6  their conclusions that the Mudflow Project offers long-term

7  ecological benefits.  Pl's Am. Mot., ECF No. 44, at 23-24.

8      It appears to the court, however, that the USFS considered the

9  short-term impacts to the species when it determined that "[n]o

10  activities are proposed within 1/4 mile of" the "nearest known owl

11  nests (ST-11 and ST-213)," which are located .6 miles to the east

12  of the Mudflow Project and 1 mile to the west, respectively, and

13  when the USFS further provided that "[s]hould an owl nest be

14  located in the project area, a limited operating period . . . will

15  be required to avoid direct effects to spotted owls during the

16  breeding season." Biological Assessment, at 9-10.  The USFS also

17  seems to have explicitly taken into account short-term impacts on

18  the prey of the Northern Spotted Owl when analyzing the effects of

19  the Mudflow Project on the Northern Spotted Owl's foraging habitat.

20  See Biological Assessment, at 11-14.

21      Furthermore, the FWS clearly considered the short-term effects

22  of the Mudflow Project on both the Northern Spotted Owl and its

23  prey when it determined that:

24          1) limited detections in both historical activity
            centers [ST-211 and ST-213] since 1992 indicate a
25          low likelihood of occupancy by NSO [Northern
            Spotted Owls] within the project area, 2)
26          treatments are not proposed within nesting/roosting

19

> habitat or high-quality foraging habitat, within
> the NSO core areas, 3) treatments proposed for 171
> acres of foraging habitat within the two home
> ranges have been designed to retain the function of
> foraging habitat and, 4) a seasonal restriction
> will be placed on project activities during the
> breeding season.

2nd LOC, at 9.   Indeed, in determining the proximity of any

Northern Spotted Owls to the Mudflow Project area, the effects of

the Mudflow Project upon the any nesting/roosting habitat or high-

quality foraging habitat of the Owls, and the impacts that the

Mudflow Project might have upon the Owls' breeding season, the FWS

appears to have overtly considered the short-term effects that the

Project would have upon the species.

Contrary to Plaintiff's assertion, Federal Defendants took

into account the short-term impacts of the Mudflow Project on both

the Northern Spotted Owl and its prey.   Plaintiff therefore fails

to establish that Federal Defendants' conclusions were arbitrary

and capricious in this regard.

### b.  Characterization of the Forest Areas

Plaintiff further asserts that the Federal Defendants

incorrectly characterized the Mudflow Project area as 65 to 85 year

old "second growth" forests, and thus, not high quality Northern

Spotted Owl habitat, when the habitat actually includes old growth

trees hundreds of years old.   Pl's Am. Mot., ECF No. 44, at 24-25.

Plaintiff cites the declaration of Monica Bond, a "wildlife

biologist with expertise in wildlife biology, ecology, and

1   behavior." Bond Decl., ECF No. 43, Att. 2.[5]  Bond asserts that she

2   "was dumbfounded when [she] saw the large size of the trees

3   proposed for logging within Northern Spotted Owl Critical Habitat."

4   Id. at 6, ¶ 14.  In support of her testimony regarding the size of

5   the trees, Bond submits a series of photographs of a person

6   standing beside marked tree trunks.  Bond Photos, ECF No. 43, Atts.

7   3-5, 7, 9-11.  Plaintiff also cites the declaration of Denise

8   Boggs, "the Executive Director and a member of Conservation

9   Congress," who asserts that many of the trees marked for cutting

10  "are large, old trees."  Boggs Decl., ECF No. 43, Att. 12, at 2,

11  ¶ 4.  Boggs further states, "We measured trees marked for cutting

12  up to 43 inches in diameter at breast height. . . .  These trees

13  are not 60-80 year old 'second growth' forest," but instead "are

14  ─────────────

15      [5] A court may consider evidence outside the administrative
    record for the limited purposes of reviewing a plaintiff's ESA
16  claim.  Western Watersheds Project v. Kraayenbrink, 632 F.3d 472,
    497 (9th Cir. 2011), cert. denied, 132 S.Ct. 366 (2011).  Thus, to
17  the extent that Plaintiff's claims are brought under the ESA's
    citizen suit provision, the court considers the Boggs and Bond
18  declarations and attachments.
        When reviewing a claim under the APA standard of review,
19  however, an agency action must typically be judged on the rationale
    and record that led to the decision.  See, e.g., Beno v. Shalala,
20  30 F.3d 1057, 1073-74 (9th Cir. 1994).  However, a court is "not
    straightjacketed to the original record in trying to make sense of
21  complex technical testimony," but may consider evidence not
    included in the administrative record to "clarif[y] a dispute that
22  . . . was less than clear from the original record."  Bunker Hill
    Co. v. Envtl. Prot. Agency, 572 F.2d 1286, 1292 (9th Cir. 1977).
23  Here, Plaintiff's submitted evidence is clearly meant to support
    its assertion that the Federal Defendants' findings are belied by
24  "simple observation."  See Pl's Am. Mot., ECF No. 44, at 25.  To
    the extent that Plaintiff's claims are brought pursuant to the APA,
25  the court considers the Boggs and Bond declaration and attachments
    to ascertain whether the Federal Defendants considered the evident
26  size of the Mudflow Project area trees when making its habitat
    determination.

1    old growth trees hundreds of years old." <u>Id.</u>

2       Plaintiff's submitted evidence does not establish that the

3    Federal Defendants made an arbitrary and capricious assessment of

4    habitat quality.  Even if the court agrees that the trees in the

5    submitted photographs appear to be large as compared to the person

6    in the photograph and therefore also appear to be old, that

7    agreement does not call into question the complex and technical

8    analyses and judgments of the USFS and the FWS in their assessment

9    of the characteristics of the habitat affected by the Mudflow

10   Project.  The court declines to disturb the Forest Service's

11   discretion in making technical analyses and judgments of the

12   Mudflow Project habitat--a subject clearly within the agency's area

13   of expertise.  <u>See</u> <u>Leaque Of Wilderness Defenders Blue Mountains</u>

14   <u>Biodiversity Project v. Allen</u>, 615 F.3d 1122, 1131 (9th Cir.

15   2010).[6]

16      Thus, the court finds that the Plaintiff fails to establish

17   that the Federal Defendants' assessment of habitat quality was

18   arbitrary and capricious.

19                    **c.  Threat of Barred Owls**

20      Plaintiff argues that the USFS's biological assessment fails

21   to discuss the Mudflow Project's potential to facilitate the

22   invasion of Barred Owls, and FWS's Second Letter of Concurrence

23   inappropriately minimizes the threat of Barred Owls and fails to

24

25          [6] While the photos are opaque, the affidavit says that certain
     trees were measured.  Although troubling, the deference the court
26   owes the agency's technical evaluation disposes of the issue.

1  use the best available science.  Pl's Am. Mot., ECF No. 44, at 25-
2  26.

3      Although Plaintiff bases its argument, in part, on the
4  assertion that "FWS has conducted no surveys for Spotted Owl[]s in
5  the Mudflow Project area since 2007," Pl's Am. Mot., ECF No. 44,
6  at 26, the FWS 2nd Letter of Concurrence, in fact, indicates that
7  "[t]he Mudflow [P]roject area has been surveyed annually for NSOs
8  from 2004 to 2011," FWS 2nd LOC, at 6.

9      Furthermore, the FWS's 2nd Letter of Concurrence explicitly
10 discusses the threat of Barred Owls to Northern Spotted Owls in
11 relation to the Mudflow Project and references the FWS's analysis
12 of recovery planning for the Northern Spotted Owl, which is based
13 upon the 2011 Revised Recovery Plan for the Northern Spotted Owl.
14 See FWS 2nd LOC, at 7, 12.  All parties agree that the 2011 Revised
15 Recovery Plan for the Northern Spotted Owl represents the "best
16 available science."  The FWS 2nd Letter of Concurrence states:

17          Barred owls are recognized as a significant threat
            to the recovery of the NSO (USFWS 2011).  Although
18          barred owls have not been detected in the project
            area, given the local presence of barred owls and
19          their current rate of spread, it is likely that
            barred owls could move into the project area in the
20          foreseeable future.  Results of a recent study . .
            . suggest that in environments where the two
21          species compete directly for resources, maintaining
            larger amounts of older forest (nesting/roosting)
22          may help NSOs to persist, at least in the short
            term.  Our evaluation of the Mudflow Project
23          therefore focused on whether proposed treatments
            could potentially act to exacerbate competitive
24          interactions between the two species by reducing
            the availability of high-quality habitat (see
25          Recovery Planning for NSO section . . . ).  As
            described below, the treatments prescribed by the
26          Mudflow project are not proposed for

1  
2  
3  
4  
5  

> nesting/roosting and other high-quality habitat, and therefore, it is unlikely that the Mudflow project will exacerbate competitive interactions between the two species. In addition, because survey results suggest that neither barred owls nor territorial NSO currently occupy the treatment areas, the direct influence of barred owls was not a factor in determining the effects of this project on NSO.

6   FWS 2nd LOC, at 7 (italics included). Plaintiff's arguments fail

7   to establish that the FWS arbitrarily and capriciously minimized

8   the threat of Barred Owls in its analysis. Additionally, because

9   the FWS explicitly references its "Recovery Planning for NSO

10  section," which relies upon the 2011 Revised Recovery Plan for the

11  Northern Spotted Owl, the FWS analysis appears to be using the

12  "best available science."

13      Although the USFS's Biological Assessment does not explicitly

14  discuss any potential invasion of Barred Owls--a threat which was

15  identified in the 2011 Revised Recovery Plan for the Northern

16  Spotted Owl--the USFS's Biological Assessment was published in

17  2008, years before the 2011 Revised Recovery Plan for the Northern

18  Spotted Owl was issued, and an updated memorandum to the Biological

19  Assessment was made in May 3, 2011, over a month before the 2011

20  Revised Recovery Plan was released. See Memorandum: Mudflow

21  Vegetation Management Project Biological Assessment Update,

22  MAR002420 (May 3, 2011); 2011 Revised Recovery Plan for the

23  Northern Spotted Owl, FWS AR 002765. Absent evidence that the USFS

24  was aware of the potential threat of Barred Owl invasion due to the

25  Mudflow Project at the time that its Biological Assessments were

26  conducted, yet failed to take that evidence into account, the court

1  cannot determine that the USFS failed to consider the best

2  scientific data available to it at the time.  It also appears to

3  the court that the fact that the FWS's 2nd Letter of Concurrence

4  later discussed the Barred Owl threat in some detail in concurring

5  with the USFS's Biological Assessment cures the Biological

6  Assessment's failure to consider the Barred Owl threat before the

7  release of the 2011 Revised Recovery Plan.

8      Furthermore, the contents of a Biological Assessment are

9  discretionary.  The applicable regulations state that "[t]he

10  contents of a biological assessment are at the discretion of the

11  [action] agency and will depend on the nature of the Federal

12  action." 50 C.F.R. § 402.12(f).  See also Strahan v. Linnon, 967

13  F. Supp. 581, 594 (D. Mass. 1997) (citing Bays' Legal Fund v.

14  Browner, 828 F. Supp. 102, 110 (D. Mass. 1993) ("there are no

15  strict requirements for what the biological assessment should

16  include; its contents are discretionary within the agency preparing

17  it.")).[7]  As explained above, without evidence indicating that the

18  USFS was aware of any potential invasion of Barred Owls due to the

19  Mudflow Project in 2008, the court cannot find that the USFS abused

20

21      [7] The regulation does list certain criteria that the agency
   may consider.  These include: (1) the results of an on-site
22  inspection of the area affected by the action to determine if
   listed or proposed species are present or occur seasonally; (2) the
23  views of recognized experts on the species at issue; (3) a review
   of the literature and other information; (4) an analysis of the
24  effects of the action on the species and habitat, including
   consideration of cumulative effects, and the results of any related
25  studies; and (5) an analysis of alternative actions considered by
   the Federal agency for the proposed action.  50 C.F.R. § 402.12(f).
26

1  its discretion in failing to address that threat in its Biological

2  Assessment.

3       Plaintiff therefore fails to demonstrate that the USFS and FWS

4  were arbitrary and capricious in their consideration, or failure

5  to explicitly consider (in the case of the USFS), any threats of

6  invasion by Barred Owls due to the Mudflow Project.

7            **d.  Effects of "Landing" Construction**

8       Plaintiff argues that the FWS failed to address the adverse

9  modification and destruction of critical habitat that will likely

10 result from "landing" construction.  Pl's Am. Mot., ECF No. 44, at

11 26-27.

12      In discussing the Mudflow Project's landing construction, the

13 FWS's 2nd Letter of Concurrence states that:

14          Within the project area there are approximately 73
            existing landings that would be reused, along with
15          an   estimated   55   new   landings   proposed   for
            construction.  All existing and proposed landings
16          are located within existing treatment units and are
            often directly adjacent to roads.  Landing size
17          will vary between 0.25 and 0.5 acres depending on
            unit volume.  Existing landings and openings will
18          be used when available, and Forest biologists will
            work with the Sale Administrator to encourage
19          placing landings outside of high quality foraging
            habitat, where possible.  A conservatively high
20          estimate of 10 acres of foraging habitat would be
            affected due to landing construction.  Landings are
21          not   proposed   within   nesting/roosting   habitat,
            Riparian Reserves, or NSO core areas.  Due to their
22          small size and placement outside of high-quality
            habitat, the effects of landing construction are
23          considered negligible in the scope of the Project.

24 FWS 2nd LOC, at 6.

25      Plaintiff has produced no evidence to indicate that, contrary

26 to the FWS's assessment, the proposed landings will adversely

1  affect critical habitat for the Northern Spotted Owl. Plaintiff

2  argues that "[l]anding construction results in the complete

3  destruction of Owl habitat," and "[a]t a minimum it must be

4  considered adverse modification," but cites no evidence in support

5  of those assertions. <u>See</u> Pl's Am. Mot., ECF No. 44, at 27.

6

7       The Ninth Circuit has provided that "an adverse modification

8  occurs only when there is a direct or indirect alteration that

9  appreciably diminishes the value of critical habitat," and that

10 "[a]n area of a species' critical habitat can be destroyed without

11 appreciably diminishing the value of a critical habitat for the

12 species' survival or recovery." <u>Butte Environmental Council v.</u>

13 <u>U.S. Army Corps of Engineers</u>, 620 F.3d 936, 948 (9th Cir. 2010)

14 (internal quotations omitted) (emphasis omitted). Even if

15 Plaintiff's assertion that "[l]anding construction results in

16 complete destruction of Owl habitat" is credited, according to the

17 Ninth Circuit, that destruction may not necessarily "appreciably

18 diminish[] the value of the critical habitat," and thus, that

19 destruction does not necessarily rise to the level of an adverse

20 modification. Plaintiff's argument, that the landing construction

21 itself requires the FWS to conclude that an adverse modification

22 will necessarily occur, therefore fails.

23      Thus, Plaintiff has failed to show that the FWS abused its

24 discretion in determining that adverse affects on Northern Spotted

25 Owls are unlikely to occur.

26 ////

1          **e.  Cumulative Effects of Past Logging and USFS Projects**

2          Plaintiff argues that the USFS and the FWS failed to analyze

3     the cumulative effects of past logging and USFS projects on the

4     Northern Spotted Owl when evaluating the Mudflow Project. Pl's Am.

5     Mot., ECF No. 44, at 27-30.

6          Although agencies are required to evaluate the cumulative

7     effects on a listed species or critical habitat during formal

8     consultation, see 50 C.F.R. § 402.14(g)(3)-(4), no such requirement

9     binds the action or the consulting agency during informal

10    consultation, cf. 50 C.F.R. § 402.13. Furthermore, in completing

11    the Biological Assessment, the USFS could have, but was not

12    required to include a consideration of cumulative effects. 50

13    C.F.R. § 402.12(f)(4). Because, as explained above, the contents

14    of a Biological Assessment are discretionary, the court is

15    unwilling to find that the USFS abused its discretion in failing

16    to consider a factor which it was not required to consider in the

17    first instance.

18         It is particularly difficult for the court to find that the

19    USFS and the FWS abused their discretion in failing to consider

20    cumulative effects where, as here, Plaintiff's argument hangs upon

21    its conflation of the technical and colloquial meanings of the word

22    "degrade." In essence, Plaintiff argues that, according to the

23    USFS and the FWS, "degradations" will occur to the critical

24    habitat, and that "a large amount of degradation from repetitive

25    timber sale projects, even if designed to benefit the Owl over the

26    long-term, simply must have some short-term impacts to the Owl and

1   are likely impeding its recovery."  Pl's Am. Mot., ECF No. 44, at

2   29.  Although Plaintiff's argument appears facially valid, the

3   argument loses its force in a regulatory world in which words are

4   not given their plain meanings.

5       According to the Biological Assessment, "degraded" is defined

6   as "a reduction in some habitat components," without a loss of

7   "function at the current habitat level."  Biological Assessment,

8   at 11.  The FWS's Second Letter of Concurrence stretches the common

9   understanding of the word "degrade" further by providing that:

10          The term *degraded* signifies when treatments
            influence the quality of habitat by the removal or
11          reduction of habitat elements but *not to the degree
            where existing habitat function is changed* . . . .
12          this category includes activities that *may be
            neutral or beneficial to habitat function* even
13          though habitat elements are being reduced.

14   FWS 2nd LOC, at 7 (emphasis included).  In light of a definition of

15   "degrade" that could mean "beneficial to habitat function," and

16   absent further proof to the contrary, the court is unable to agree

17   with Plaintiff that a series of "degradations" will necessarily

18   have an adverse effect upon the Northern Spotted Owl critical

19   habitat.

20       Thus, Plaintiff has failed to demonstrate that the FWS and the

21   USFS arbitrarily and capriciously determined that, although

22   Northern Spotted Owl critical habitat will be "degraded" by the

23   Mudflow Project, such "degradation" does not rise to the level of

24   an "adverse modification."

25   ////

26   ////

1     **f.  Analyzing the Mudflow Project's Effects Upon the**

2     **Recovery of the Northern Spotted Owl**

3     Finally, Plaintiff argues that FWS and USFS improperly failed

4 to analyze the Mudflow Project's effects upon the recovery, as

5 opposed to the mere survival, of the Northern Spotted Owl.  Pl's

6 Am. Mot., ECF No. 44, at 30-31.  Underlying Plaintiff's argument

7 is Plaintiff's unsupported assumption that "it appears clear that

8 'degrading' a species['s] critical habitat may well set back its

9 recovery."  Id. at 31.  However, as the court previously discussed,

10 in light of the peculiar way that the agencies employ the term

11 "degrade," it is not at all clear to the court that "degrading" a

12 species' critical habitat would necessary adversely affect the

13 recovery of the species.  Without evidence to support Plaintiff's

14 position, Plaintiff fails to demonstrate that the FWS and the USFS

15 abused their discretion in this regard.[8]

16     Because Plaintiff has failed to produce evidence demonstrating

17 that the Federal Defendants abused their discretion in determining

18 that the Mudflow Project is not likely to adversely affect the

19 Northern Spotted Owl, Plaintiff has not established a probability

20

---

21 [8] Moreover, the FWS's Second Letter of Concurrence explicitly
states that it is based, in part, on the 2011 Revised Recovery
22 Plan.  See FWS 2nd LOC, at 2.  The 2011 Revised Recovery Plan for
the Northern Spotted Owl, in turn, explains that "[r]ecovery plans
23 describe reasonable actions and criteria that are considered
necessary to recover listed species."  U.S. Fish & Wildlife Serv.,
24 2011 Revised Recovery Plan for the Northern Spotted Owl, FWS AR
002766 (June 28, 2011).  If the FWS's Second Letter of Concurrence,
25 in fact, adheres to the recommendations and analyses of the 2011
Revised Recovery Plan, it stands to reason that the FWS's Second
26 Letter of Concurrence takes into account the recovery, as opposed
to the mere survival, needs of the species.

1  of  succeeding  on  the  merits  of  its  claim  that  the  Federal

2  Defendants violated the ESA consultation requirements.  The court

3  therefore denies Plaintiff's motion for a preliminary injunction.

4  Plaintiff's request that the court waive the bond requirement is

5  moot.

6                        **IV.  CONCLUSION**

7    For the foregoing reasons, Plaintiff's motion for a preliminary

8  injunction, ECF No. 43, is DENIED.

9    IT IS SO ORDERED.

10    DATED: June 19, 2012.

                                LAWRENCE K. KARLTON
                                SENIOR JUDGE
                                UNITED STATES DISTRICT COURT