1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   CONSERVATION CONGRESS,              No.  CIV. S-11-2605 LKK/EFB

12              Plaintiff,

13        v.                             **ORDER**

14   UNITED STATES FOREST SERVICE,

15              Defendant.

16              and

17   SIERRA PACIFIC INDUSTRIES,

18              Defendant
                Intervenor.
19

20

21        Plaintiff Conservation Congress sues defendant United States

22   Forest Service and defendant-intervenor Sierra Pacific

23   Industries, alleging that the Forest Service, in approving a

24   challenged timber project, failed to adequately consider that

25   project's impacts on the habitat of the northern spotted owl.

26   Plaintiff's action arises under the National Environmental Policy

27   Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq*.

28   ///

                                    1

Plaintiff now moves for a temporary restraining order enjoining the project. The parties stipulated to waive oral argument (originally set for Wednesday, March 19, 2014) and instead submitted the motion on the papers. (ECF No. 84.) Having considered the parties' submissions and the record, the court will deny the motion, for the reasons set forth below.

**I.   BACKGROUND**

**A. Statutory Background**

The court begins by noting relevant aspects of NEPA and its implementing regulations, in order to provide context for the discussion that follows.

NEPA is intended to "ensure[] that federal agencies are informed of environmental consequences before rendering decisions and that the information is available to the public." Okanogan Highlands Alliance v. Williams, 236 F.3d 468, 473 (9th Cir. 2000). "NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 756-57 (2004).

Under NEPA, federal agencies must prepare an Environmental Impact Statement ("EIS") prior to undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The EIS must address

> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

2

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Id.

Regulations promulgated under NEPA provide that an EIS must consider "[i]mpacts, which may be (1) [d]irect; (2) indirect; [or] (3) cumulative." 40 C.F.R. § 1508.25(c).[1] A "direct effect" is one "caused by the action and occur[ring] at the same time and place." 40 C.F.R. § 1508.8(a). An "indirect effect" is both:

caused by the action and ... later in time or farther removed in distance, but [is] still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

40 C.F.R. § 1508.8(b). A "cumulative impact" is:

the impact on the environment which results from the incremental impact of the action when added to other past, present, and **reasonably foreseeable** future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively

---

[1] "Effects and impacts as used in these regulations are synonymous." 40 C.F.R. § 1508.8. Accordingly, and in keeping with the jurisprudence in this area, this order uses the terms "effect" and "impact" interchangeably.

3

1

2
    significant actions taking place over a period of time.

3
40 C.F.R. § 1508.7 (emphasis added).

4
    A cumulative impacts analysis "must be more than

5
perfunctory; it must provide 'a useful analysis of the cumulative

6
impacts of past, present, and future projects.'" Kern v. U.S.

7
Bureau of Land Mgmt., 284 F.3d 1062, 1075 (9th Cir. 2002)

8
(quoting Muckleshoot Indian Tribe v. U.S. Forest Serv., 177 F.3d

9
800, 810 (9th Cir. 1999)). Nevertheless, "none of NEPA's

10
statutory provisions or regulations requires the Forest Service

11
to affirmatively present every uncertainty in its EIS." The Lands

12
Council v. McNair, 537 F.3d 981, 1001 (9th Cir. 2008) (en banc),

13
overruled on other grounds by Winter v. Natural Res. Def.

14
Council, Inc., 555 U.S. 7 (2008).

15
    Review of an EIS is governed by the Administrative Procedure

16
Act ("APA"). Agency actions may be properly overturned where they

17
are "arbitrary, capricious, an abuse of discretion, or otherwise

18
not in accordance with law." 5 U.S.C. § 706(2)(A). "Review under

19
the arbitrary and capricious standard is narrow, and we do not

20
substitute our judgment for that of the agency." McNair, 537 F.3d

21
at 987 (internal quotation omitted).

22
                    **B. Factual & Procedural Background**

23
    The following allegations are taken from (i) publicly-

24
available documents, (ii) the prior record herein, and (iii) the

25
declarations of the parties offered in support of, and in

26
opposition to, the instant motion.

27

28
                                      4

1  The Mudflow Vegetation Management Project ("Mudflow

2  Project") was developed by defendant Forest Service, and is

3  directed at the McCloud Flats area of the Shasta-Trinity National

4  Forest. (MAR000195.)[2] The Mudflow Project is located in Siskiyou

5  County; the project is under the auspices of the Forest Service

6  office in Shasta County. (First Supplemental Complaint ¶ 10, ECF

7  No. 40.)

8  The final EIS for the Mudflow Project, dated May 2011

9  ("Final EIS"), identifies problems such as overstocking,

10  heightened risk of fire, and areas of root disease in the

11  designated Project area. (MAR000195-196.) The Forest Service

12  therein proposes to ameliorate these conditions by applying

13  various "treatments" to the area, such as thinning overstocked

14  stands of trees, sanitizing stands infected with disease,

15  restoring wet meadow ecosystems, and burning. (MAR000197.) The

16  Final EIS provides that the preferred plan would treat 2957 acres

17  (out of 13,830 total acres) in the Mudflow Project area.

18  (MAR000195.)

19  Late-successional forests, such as those found in the

20  Project area, provide habitat for the northern spotted owl. The

21  Fish & Wildlife Service listed the northern spotted owl as a

22  threatened species on January 15, 1992. 57 Fed.Reg. 1796–1838. No

23  northern spotted owls have been detected in surveys conducted in

24  the Mudflow Project area between 2004 and 2013. (MAR000585;

25  MAR0002421; MAR010628; Bachmann Decl. ¶ 5, ECF No. 85-1.)

26

27  [2] Throughout this Order, the Forest Service administrative record
is cited as "MAR," followed by the relevant page number. The
administrative record was lodged with the court in February 2012.

28  (ECF No. 36.)

Defendant-intervenor Sierra Pacific is responsible for carrying out various Mudflow Project treatments pursuant to a timber sale contract with the Forest Service. (Bachmann Decl. ¶ 6.)

Plaintiff initiated this action on October 3, 2011, naming Fish & Wildlife and the Forest Service as defendants. (ECF No. 1.) On November 21, 2011, Sierra Pacific moved to intervene; on December 15, 2011, the court granted Sierra Pacific's motion. (ECF Nos. 13, 22.)

On March 22, 2012, plaintiff filed the operative First Supplemental Complaint. ("FSC," ECF No. 40.) The FSC set forth claims under NEPA and the Endangered Species Act ("ESA"), brought against Fish & Wildlife, the Forest Service, and Sierra Pacific.

On April 9, 2012, plaintiff moved for a preliminary injunction under the ESA, claiming that the Forest Service violated ESA Section 7(a)(2) by failing to engage in formal consultation with Fish & Wildlife regarding the Mudflow Project. (ECF Nos. 43, 44.) Plaintiff sought to enjoin both federal agencies "from commencing or implementing the Mudflow Project or any portion thereof until this case is fully resolved on the merits." (ECF No. 45.) On June 19, 2012, the court denied the motion, on the grounds that plaintiff had failed to establish a probability of success on the merits of its ESA claims. Conservation Congress v. U.S. Forest Service, No. CIV S-11-2605 LKK/EFB, 2012 WL 2339765, 2012 U.S. Dist. LEXIS 84943 (E.D. Cal. Jun. 19, 2012). Specifically, the court held that neither the Forest Service nor Fish & Wildlife had acted in an arbitrary and capricious manner in determining that the Mudflow Project was not

likely to adversely affect the northern spotted owl, and on those
grounds, declining to enter into formal consultation. On June 13,
2013, the Ninth Circuit affirmed, finding that plaintiff's
"challenge to the district court's denial of its preliminary
injunction [wa]s premised on a misunderstanding of regulatory
terms, an unsupported reading of a duty to consider cumulative
effects under ESA section 7(a)(2), and selected portions of the
record taken out of context." <u>Conservation Congress v. U.S.</u>
<u>Forest Service</u>, 720 F.3d 1048, 1058 (9th Cir. 2013).

Subsequently, on February 10, 2014, plaintiff voluntarily
dismissed its ESA claims, and also dismissed Fish & Wildlife as a
defendant. (ECF No. 73.) At present, the Forest Service remains
as a defendant and Sierra Pacific remains as defendant-
intervenor; plaintiff's sole claim arises under NEPA.

To date, Sierra Pacific has completed work on approximately
1585 acres (out of 2957 total acres) proposed for treatment under
the Mudflow Project. (Bachmann Decl. ¶ 10.) Sierra Pacific had
previously ceased work on the Mudflow Project in mid-March 2013.
(Hadley Decl. ¶ 8, ECF No. 82.) On January 14, 2014, plaintiff's
counsel was informed that Sierra Pacific would not resume Mudflow
Project operations until "late summer" of 2014. (Dugan Decl. ¶ 3,
ECF No. 77-5.) She began working with opposing counsel on a
briefing schedule for cross-motions for summary judgment on
plaintiff's NEPA claims. (Id. ¶ 5.) On March 6, 2014, plaintiff's
counsel was informed that Sierra Pacific had changed its start
date for resuming operations, to March 13, 2014. (Id. ¶ 6.) On
March 11, 2014, plaintiff's counsel was informed that the date
had changed again, to March 24, 2014. (Id. ¶ 13.)

1    Sierra Pacific's Division Timber Manager justifies the new

2  start date as follows:

3           [Sierra Pacific] needs to resume Mudflow
            operations now for several reasons. First,
4           whereas unusually adverse weather conditions
            in California (severe drought followed by
5           torrential rains) have constrained [Sierra
            Pacific]'s operations on other projects, the
6           Mudflow Project is currently operable.
            Extremely heavy rains that have left other
7           projects with saturated soils have drained
            from the Mudflow Project's sandy soils.
8           Because of the unusual weather constraints
            elsewhere, [Sierra Pacific]'s logger
9           currently is without work, leaving at least
            20 workers idle and unable to earn family
10          wages. This situation, coupled with the lack
            of a snow pack on Mt. Shasta which bodes
11          extremely ill for the upcoming fire season
            and likely will halt late summer operations,
12          calls for operating the Mudflow Project now.
            (Hadley Decl. ¶ 9.)
13

14

15  On March 13, 2014, plaintiff filed the instant motion for a TRO,

16  seeking an order that would enjoin the Forest Service and Sierra

17  Pacific "from proceeding with the Mudflow timber sale pending a

18  final decision on the merits of this case. No bond is required."[3]

19  (Proposed Order, ECF No. 77-12.)

20  _____

21  [3] While no means dispositive of the questions presented herein, it
    bears mention that plaintiff is aware that this TRO is a long
22  shot. In its points and authorities in support of its 2012 motion
    for a preliminary injunction, plaintiff wrote, "In candor, if
    Conservation Congress cannot obtain preliminary injunctive relief
23  under the more generous standards provided by ESA, the premise of
    its first two claims for relief, it would be unlikely to obtain
24  such relief under [NEPA], the premise of its third claim for
    relief. [. . .] Conversely, because Conservation Congress
25  believes it satisfies the modified standard for injunctive relief
    found in the ESA, arguing alternatively is unnecessary." (ECF No.
26  44 at 7 n. 1.) On appeal, in its opening brief to the Ninth
    Circuit, plaintiff wrote, "Candidly, Conservation Congress moved
27  only on its ESA claims because it believed that if it could not
    prevail on a motion for preliminary injunction under the more
28

1    **II.   STANDARD**

2         The issuance of injunctions and of temporary restraining

3    orders is governed by Federal Rule of Civil Procedure 65.[4] The

4    standard for issuing a temporary restraining order is essentially

5    the same as that for issuing a preliminary injunction. See

6    Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832,

7    839 n.7 (9th Cir. 2001) (stating that the analysis for temporary

8    restraining orders and preliminary injunctions is "substantially

9    identical"). The moving party must demonstrate that (1) it is

10   likely to succeed on the merits; (2) it is likely to suffer

11   irreparable harm in the absence of preliminary relief; (3) the

12   balance of equities tips in its favor; and (4) that the relief

13   sought is in the public interest. Winter v. Natural Res. Def.

14   Council, Inc., 555 U.S. 7, 20 (2008). The Ninth Circuit has held

15   that injunctive relief may issue, even if the moving party cannot

16   show a likelihood of success on the merits, if "serious questions

17   going to the merits and a hardship balance that tips sharply

18   toward the plaintiff can support issuance of an injunction,

19   assuming the other two elements of the Winter test are also met."

20   Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135

21   (9th Cir. 2011) (internal quotation omitted).

22        The moving party bears the burden of persuasion, and must

23   make a clear showing that it is entitled to such relief. Winter,

24   _____

25   generous standards of the ESA, discussed below, it was unlikely
     to do so under NEPA." (Pl. 9th Cir. Op. Br., 2012 WL 3342647 at

26   *10 n. 1.) In plaintiff's defense, it was not represented by its
     current lead counsel at the time those briefs were authored.

27

28   [4] Hereinafter, the term "Rule" refers to the applicable Federal
     Rule of Civil Procedure.

9

555 U.S. at 22.

In deciding whether to issue a TRO, the district court "may give even inadmissible evidence [including hearsay] some weight, when to do so serves the purpose of preventing irreparable harm before trial." <u>Flynt Distrib. Co. v. Harvey</u>, 734 F.2d 1389, 1394 (9th Cir. 1984).

Every temporary restraining order must:

> (A) state the reasons why it issued;
>
> (B) state its terms specifically; and
>
> (C) describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required.

Rule 65(d)(1).

**III.   ANALYSIS**

Plaintiff essentially makes two arguments for issuance of a TRO: first, that the Forest Service failed to analyze the cumulative impact of several major timber sales near the Mudflow Project in the Final EIS, and second, that the Final EIS fails to discuss cumulative impacts in any meaningful detail. These arguments are addressed in turn below.

According to plaintiff, it is likely to succeed on the merits of its NEPA claim because "[t]he Forest Service failed to identify several major timber sales in the area, and failed to conduct any analysis of their cumulative effects." (Mot. 19, ECF No. 77.) Plaintiff claims to have identified "ongoing and reasonably foreseeable timber sales in close geographic proximity to the Mudflow [Project], which the Forest Service did not fully identify or address in its cumulative impacts analysis." (Id.)

1  The timber sales in question, whose cumulative impacts plaintiff
2  claims the Final EIS does not adequately address, are termed:
3                1. Harris Vegetation Management Project
4                2. Porcupine Vegetation and Road Project
5                3. Thimbleberry I
6                4. Thimbleberry II
7                5. Bordertown (Mot. 20.)
8  As will be seen, plaintiff's argument does not support its
9  motion.
10      The Final EIS delineates the following cumulative effects
11  analysis area: "Cumulative effects for the northern spotted owl
12  are bounded by the Critical Habitat Unit (CHU) CA-2 which
13  encompasses approximately 89,028 acres of National Forest and
14  private lands." (MAR 000299.) A map on page 95 of the Final EIS
15  shows the Mudflow Project area in relation to CHU CA-2. (MAR
16  000300.) The Final EIS notes, accurately, that "the Mudflow
17  Project is almost entirely within" the boundaries of CHU CA-2.
18  (MAR 000301.)
19      Plaintiff does not raise a challenge under the APA to the
20  agency's determination of CHU CA-2 as the appropriate area for
21  the cumulative effects analysis (whether as arbitrary and
22  capricious, or as an abuse of discretion). Further, the Ninth
23  Circuit has recognized that challenges to the geographic scope of
24  an EIS are distinct from, rather than implicit in, a cumulative
25  impacts analysis. "In this appeal, Plaintiffs argue that the
26  geographic scope of the Service's EIS *for this project* is too
27  small. This does not appear to be a cumulative impact challenge."
28  Inland Empire Pub. Lands Council v. U.S. Forest Service, 88 F.3d

1  754, 764 (9th Cir. 1996) (emphasis in original). Finally, it is

2  well-settled that the determination of a cumulative effects

3  analysis area is a domain in which agencies are entitled to

4  deference. "Cumulative environmental impacts are, indeed, what

5  require a comprehensive impact statement. But . . .

6  identification of the geographic area within which they may

7  occur, is a task assigned to the special competency of the

8  appropriate agencies." Kleppe v. Sierra Club, 427 U.S. 390, 413-

9  14 (1976). Accord Native Ecosystems Council v. Dombeck, 304 F.3d

10  886, 902 (9th Cir. 2002) ("We acknowledge that the determination

11  of the scope of an analysis area requires application of

12  scientific methodology and, as such, is within the agency's

13  discretion") (citing Kleppe). More than twelve pages of the Final

14  EIS are devoted to an analysis of cumulative impacts within CHU

15  CA-2. (MAR000299 – MAR000312). The Forest Service therein

16  explains its choice of boundaries as follows:

17          Given the uncertainty around the [2008
18          northern spotted owl] Recovery Plan and the
            designation of critical habitat for the
19          [northern spotted owl], the Forest [Service]
            has chosen to use the larger and more
20          comprehensive 1992 critical habitat boundary
            for cumulative effects analysis. This
21          boundary not only encompasses the 2008
            boundaries in this area, it also has the
22          greatest probability of including as much of
            the upcoming proposed critical habitat
23          boundary, expected within the next year.
            (MAR000300.)
24

25  This is a reasoned justification for the boundaries chosen. Given

26  the foregoing, and the absence of any argument to the contrary by

27  plaintiffs, the court declines to second-guess the Forest

28

                                  12

1   Service's selection of CHU CA-2 as the appropriate cumulative

2   effects analysis area.

3       Having accepted the validity of the boundaries chosen by the

4   Forest Service, the court must reject plaintiff's argument that

5   the agency violated NEPA by failing to consider the cumulative

6   impacts of the Harris Vegetation Management Project and the

7   Porcupine Vegetation and Road Project. Defendant-intervenor

8   Sierra Pacific has provided maps showing the location of these

9   projects in relation to CHU CA-2. (Weiss Decl. Exhs. 2 & 3, ECF

10  Nos. 83-2 & 83-3.) Both Projects appear to be sited outside of

11  CHU CA-2's boundaries, and therefore, exempt from the cumulative

12  effects analysis. Similarly, while there is no question that the

13  Thimbleberry I timber harvesting project was publicly noticed on

14  October 9, 2009 (Dugan Decl. Exh. B, ECF No. 77-7), *i.e.*, well

15  before the May 2011 release of the Final EIS, nevertheless,

16  according to both the Forest Service and Sierra Pacific,

17  Thimbleberry I lies on land outside of the CHU CA-2 cumulative

18  effects analysis area. (Forest Service Oppo. 19; Sierra Pacific

19  Oppo. 20.) Accordingly, this project is also exempt from the

20  cumulative effects analysis.

21      What remains are the timber harvesting plans which plaintiff

22  terms Thimbleberry II and Bordertown. It appears that

23  Thimbleberry II was publicly noticed on January 8, 2014, and

24  Bordertown on August 1, 2013. (Dugan Decl. Exhs. A & C, ECF Nos.

25  77-6 & 77-8.) NEPA regulations define "reasonably foreseeable

26  future actions" as "[t]hose Federal or non-Federal activities not

27  yet undertaken, for which there are existing decisions, funding,

28  or identified proposals." 36 C.F.R. § 220.3. The Forest Service

13

1  is under no statutory or regulatory obligation to consider

2  actions which are not reasonably foreseeable in its cumulative

3  impacts analysis. Given that the Final EIS was issued on May

4  2011, the notice dates for Thimbleberry II and Bordertown

5  indicate that neither project was a reasonably foreseeable future

6  action at the time the Final EIS issued on May 2011.

7      Plaintiff also claims that "[y]et other projects are named

8  (Algoma, Moosehead, Elk, McCloud Flats), but not described or

9  analyzed" in the Final EIS. (Mot. 20.) This contention is

10  demonstrably false. A table on page 101 of the Final EIS

11  quantifies projected effects of the Algoma and Moosehead projects

12  on northern spotted owl habitat. (MAR 000306). A map on the

13  following page displays all four of the named projects in spatial

14  relation to CHU CA-2. (MAR 000307.) The accompanying text

15  provides that "[t]he USFWS consulted with the Forest on . . .

16  the . . . Algoma Vegetation Management Project[]; the other three

17  projects are in the planning and analysis stage." (Id.) Further

18  analysis of the Algoma Project is set forth on page 103 of the

19  Final EIS. (MAR000308.) As for the Elk and East McCloud Projects,

20  defendant Forest Service contends:

21          [T]he [] Final EIS explains that effects
22          analyses for the Elk and East McCloud
            Projects were incomplete at the time of the
23          [] Final EIS, therefore the amount of habitat
            affected, and the nature of those effects,
24          were not yet known. [MAR000101]. Forest
            Service NEPA regulations define reasonably
25          foreseeable future actions as "Federal or
            non-Federal activities not yet undertaken,
26          for which there are existing decisions,
            funding, or identified proposals." 36 C.F.R.
27          § 220.3. "Identified proposals" for Forest
            Service actions are those where the Forest

28

> Service "is actively preparing to make a
> decision on one or more alternatives . . .
> and the effects can be meaningfully
> evaluated." 36 C.F.R. § 220.4(a)(1). Because
> the Forest Service has not yet reached this
> stage for either the Elk or East McCloud
> Projects where no draft EIS had been prepared
> yet for either project, the Forest Service
> was not required to speculate regarding the
> potential effects of either project. (Forest
> Service Oppo. 20-21, ECF No. 85.)

The Forest Service's supporting citation to Envtl. Prot. Info. Ctr. v. U.S. Forest Service, 451 F.3d 1005, 1014 (9th Cir. 2006) (holding that it was not arbitrary and capricious for the Forest Service to omit a project whose parameters were unknown from a cumulative impacts analysis) appears apt. In short, the Final EIS's treatment of the four challenged projects (Algoma, Moosehead, Elk, and East McCloud) appears sufficient to meet NEPA standards for a cumulative impact analysis. Plaintiff's argument, that the Forest Service was required, but failed, to take these projects into account in its analysis, is unavailing.

Plaintiff's second argument, that the Forest Service "omitted any meaningful discussion of cumulative impacts from its decision making" (Mot. 21), also appears to be without merit. Plaintiff supports its argument by again asserting that the Forest Service failed to include additional timber sales projects within the cumulative effects analysis area. But as plaintiff does not identify the allegedly-omitted sales projects with any specificity, this assertion fails.

Plaintiff's final argument is difficult, if not impossible, for this court to parse. It provides:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

              With respect to the [northern spotted owl], the Forest Service concludes "[t]here will be no direct effects to the northern spotted owl under all action alternatives, there is no activity proposed within 1/4 mile of any known activity center." MAR000293. In fact, the Forest Service takes the position that removing understory will help [northern spotted owls] fly through what it characterizes as "dense and relatively impassible." [*sic*] MAR 000293. The agency asserts that the Preferred Alternative (Alt. 2) "will degrade 1,720 acres of existing [northern spotted owl] foraging habitat by reducing canopy cover but the habitat will continue to function, and will be improved by thinning treatments that open up the understory." MAR000295. The Preferred Alternative is 2,957 acres so about 60% of the project would affect [northern spotted owl] habitat. While the Forest Service purported to evaluate the cumulative effects of other areas on [northern spotted owl] habitat under the ESA, it did not do so under NEPA.[5] MAR000299. Lastly, the Forest Service recognized that since 2003, six projects within CHU CA-2 have temporarily degraded 6,514 acres of foraging/dispersal habitat (22% of the habitat). MAR000303. The Mudflow [P]roject would degrade 6,465 more acres and remove 673 acres, so another 22% of the CHU will be affected. MAR000310. Despite nearly 50% of the [northern spotted owl] foraging/dispersal habitat affected, the Forest Service does not further evaluate cumulative impacts. (Mot. 22-23.)

22

23

One can only speculate as to what this paragraph means. The court's previous decision herein, as affirmed by the Ninth

24

25

26

27

28

---

[5] This may be a reference to a sentence in the Final EIS which provides, "All private timber harvest plans must be reviewed by the State of California with consultation from the U.S. Fish and Wildlife Service (USFWS) under section 9 of the Endangered Species Act for the possibilities of prohibited take." (MAR000299.) This is the only reference to the ESA on the cited page. It is also an inarguable statement of applicable law.

1    Circuit, made clear that plaintiff's argument therein "h[ung]

2    upon its conflation of the technical and colloquial meanings of

3    the word 'degrade.'" Conservation Congress, 2012 WL 2339765 at

4    *12, 2012 U.S. Dist. LEXIS 84943 at *38. Something similar

5    appears to be going on in this paragraph, given plaintiff's

6    interchanging of the terms "degrade" and "affect." The Final EIS

7    makes clear that "'degrading' is a categorical term used by the

8    [U.S. Fish & Wildlife Service] that does not necessarily refer to

9    a loss of habitat value. Habitat 'degradation' is used by the

10   USFWS in their [northern spotted owl] tracking system to denote

11   actions taken in habitat that maintain existing [northern spotted

12   owl] habitat functionality (i.e., 'degraded' foraging habitat

13   does remain fully functional as foraging habitat)." (MAR000303.)

14   In other words, the Forest Service's use of the term "degrade" in

15   the passages quoted by plaintiff is not alarming. And,

16   ultimately, nothing presented in the quoted paragraph convinces

17   the court that plaintiff has demonstrated any likelihood of

18   success on its cumulative impact claim under NEPA.

19       **IV.  CONCLUSION**

20       In light of the foregoing, the court hereby orders that

21   plaintiff Conservation Congress's motion for a temporary

22   restraining order is DENIED.

23       IT IS SO ORDERED.

24       DATED:  March 21, 2014.

25

26

27   LAWRENCE K. KARLTON
     SENIOR JUDGE

28   UNITED STATES DISTRICT COURT

                              17